| | | |
|---|---|---|
| ERNEST JOHNSON, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | 3:17-cv-00124-JMS-TAB |
| | ) | |
| THE CITY OF EVANSVILLE, | ) | |
| *Defendant.* | ) | |

## **ORDER**

Plaintiff Ernest Johnson, who is African American, worked for the City of Evansville's Parks Department on the mowing crew. From April 2016 to May 2016, he was not offered certain opportunities to work overtime, but his Caucasian co-worker was. Mr. Johnson initiated this litigation against the City of Evansville (the "City"), alleging race discrimination, hostile work environment, retaliation, and breach of contract. The City filed a Motion for Summary Judgment as to all of Mr. Johnson's claims, [Filing No. 43], and the motion is now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Cv. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." Johnson, 325 F.3d at 898. Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Mr. Johnson's Position With the City of Evansville

In 2016, Mr. Johnson worked as a laborer in the Department of Parks and Recreation (the "Parks Department") for the City. [Filing No. 44-1 at 3.] Charles Mangold was the Parks Department's Maintenance Supervisor from 2014 until he retired in March 2017. [Filing No. 44-10 at 3.] In the spring of 2016, the Parks Department had three mowing crews comprised of two individuals each. [Filing No. 44-10 at 4.] Mr. Johnson was assigned to a two-person mowing crew, and his partner was Reggie Haskins, who is also African American. [Filing No. 44-1 at 16; Filing No. 44-9 at 1; Filing No. 44-10 at 5.]

### B. The Collective Bargaining Agreement and the Assignment of Overtime in the Parks Department

Mr. Johnson and the other Parks Department mowers were members of the Chauffeurs, Teamsters and Helpers Local Union No. 215 (the "Union"). [Filing No. 1 at 2; Filing No. 44-4.]

The Union and the City entered into a Collective Bargaining Agreement (the "CBA") effective January 1, 2013 through December 31, 2015,[1] which provided in relevant part:

> **ARTICLE VII.** Section 9. There shall be no discrimination in the assignment of overtime. When an employee is assigned a particular task during regular work hours or a shift is extended or work is required on a succeeding shift and there are employees working, qualified to do such work on the succeeding shift, then the employee assigned to the particular task or working on the extended shift or qualified to perform work required on the succeeding shift will be offered the overtime. Thereafter, overtime shall be allocated as equitably as practical among the employees qualified to perform the work in question except when the overtime requires a crew. **This provision shall not apply to those departments within which there has been established a specific method of assigning overtime.** In those cases, the in-place method of assigning overtime can be changed by agreement and such change will be in writing and approved by the Union and the Personnel Director of the City of Evansville before it is effective.

[Filing No. 44-4 at 7-8 (emphasis added).]

Different City departments assign overtime in different ways. [Filing No. 44-1 at 18.] The Parks Department generally based overtime eligibility on seniority. [Filing No. 44-10 at 3-4 (Mr. Mangold testifying that overtime was assigned based on seniority); Filing No. 44-11 at 3 (Brian Holtz, Parks Department Executive Director, testifying that the Parks Department already had set a policy for assigning overtime before the Union and the City entered into the CBA, and that overtime was assigned by seniority); Filing No. 44-12 (Rick Norman, Parks Department mowing employee and current Union Steward, testifying: "Q: Okay. Now, when you were [working for a previous City department] how did Parks and Recreation assign overtime there? A: That started at the top. Q: Top? A: Highest seniority offered overtime first. Q: And is that the same way they did it when you moved over the Parks Maintenance? A: Yes").] Mr. Mangold testified that

---

[1] The events underlying this lawsuit occurred beginning in April 2016, after the CBA that has been submitted had terminated. [Filing No. 44-4 (CBA dated "[e]ffective January 1, 2013 through December 31, 2015").] Both parties treat the CBA that has been submitted as in effect during the relevant time period, so the Court will do the same.

on one occasion he "put it out there for anyone if they wanted to work overtime." [Filing No. 44-10 at 6.] This was a day "that happened to be there was overtime available where the need was there." [Filing No. 44-10 at 6.] Mr. Mangold did not testify regarding how he actually assigned overtime that day, after ascertaining who was interested.

When Mr. Johnson first started working at the Parks Department, Mr. Mangold would ask who wanted to work overtime, people would raise their hands, and Mr. Mangold would record who had raised their hand. [Filing No. 44-1 at 17.] Mr. Johnson was never told, or made aware, of the Parks Department's practice of assigning overtime based on seniority. [Filing No. 44-1 at 4.]

The practice of offering overtime based on seniority was in place before Mr. Johnson became a Parks Department employee. [Filing No. 44-10 at 3; Filing No. 44-11 at 3.] Out of the six employees on the seniority list for the Parks Department mowing crew, Mr. Johnson was fourth and was behind Rick Norman. [Filing No. 44-1 at 4 (Mr. Johnson testifying that Mr. Norman was more senior than he was).] The employees that were more senior to him were all Caucasian, and Mr. Haskins – Mr. Johnson's partner on his two-man mowing crew – was junior to him and is African American. [Filing No. 44-10 at 4-5.] The practice of offering overtime based on seniority was not in writing, nor was there a list of employees by seniority. [Filing No. 44-1 at 4; Filing No. 44-11 at 3.]

The Parks Department would often get information throughout the day indicating that something needed to be completed which would require overtime work, and Mr. Mangold would first offer the overtime to the most senior employee, Terry Bodell. [Filing No. 44-10 at 5.] Mr. Bodell would usually turn down overtime opportunities because he did not like to work overtime,

so Mr. Mangold would then offer overtime opportunities to the next most senior employee, Rick Norman. [Filing No. 44-10 at 5.]

### C. The Assignment of Overtime in April and May 2016

In April 2016, Mr. Mangold advised Parks Department employees that, as a result of significant grass growth that Spring, there would be overtime opportunities available to all Parks Department mowers until he told them differently. [Filing No. 44-10 at 4.] Mr. Mangold offered overtime to everyone who was available, so that they could get caught up on mowing. [Filing No. 44-1 at 3.] Mr. Mangold permitted Mr. Johnson to work overtime on the first three days of the week of April 7, 2016. [Filing No. 44-1 at 14.]

As the Parks Department got caught up on mowing, Mr. Mangold informed employees that the overtime arrangement had ended and no more overtime would be scheduled. [Filing No. 44-5 at 1; Filing No. 44-10 at 4.] Mr. Norman, who is white and who is senior to Mr. Johnson, worked overtime that day and the next, however. [Filing No. 44-1 at 3; Filing No. 44-10 at 4.]

On April 27, 2016, Mr. Johnson was tasked with cutting grass following a series of storms and tornadoes that had hit the area. [Filing No. 1 at 3.] Although he followed these instructions, Mr. Mangold harshly questioned Mr. Johnson as to what he had been doing the previous day. [Filing No. 1 at 3.] Mr. Johnson replied that he had cut grass, and picked up paper, trash, and tree limbs. [Filing No. 1 at 3.] Mr. Mangold became angry and told Mr. Johnson that other employees had been assigned to pick up debris, and Mr. Johnson should not have done so. [Filing No. 1 at 3.] Mr. Mangold belittled Mr. Johnson in front of other employees for not doing enough work, and he was the only one reprimanded at that time. [Filing No. 1 at 3-4.]

Mr. Norman was authorized to work overtime on May 4, 5, 6, and 11, 2016, but Mr. Johnson "was not extended the same opportunity for overtime." [Filing No. 1 at 4.] Mr. Johnson

testified that he does not know why Mr. Mangold offered overtime to Mr. Norman rather than to him, but that doing so was in violation of the CBA and that "if I'm doing the job, me and another black man doing the job and they refuse to give us the opportunity to honor the contract, that's a violation, to me." [Filing No. 44-1 at 6.]

**D. Mr. Johnson's EEOC Charge**

On May 4, 2016, Mr. Johnson filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"). [Filing No. 44-2.] He alleged discrimination based on race, and stated:

> On April 4, 2016 the Maintenance Super, Charlie Mangold, white male, asked me and another employee, Reggie Haskins, black male, if we wanted to work overtime and we agreed and worked approximately 2 hours over. The next day we were allowed to work over again; on the third day, April 6, 2016, Mr. Mangold asked a third time, but only I accepted the 2 ½ hours of overtime. On that day he announced that no more overtime would be granted and that this was the last day for overtime. But on that day the entire crew noticed that he allow[ed] a white co-worker, Rick Norman to work overtime. On April 7th and 8th Rick Norman was again allowed to work overtime but I was not afforded the opportunity to do so even though I was the next in line to work overtime in accordance with the collective bargaining agreement. Mr. Mangold has targeted me for intimidation and verbal harassment, as though he is attempting to provoke me to respon[d] to his hostile and threat[en]ing behavior and gestures. Another example of the harsh treatment I am receiving from Mr. Mangold occurred on April 26-28. As a result of a severe storm and tornado in the area, we were told to survey the parks for damage and to report any electrical damage. Afterwards I was the only one reprimanded and belittled in front of the other crew members for "not doing enough work["] even though I am doing everything requested of me. Mr. Mangold even told me not to pick up trash in the park because he had others doing that assignment.

> I feel that I have been the victim of discrimination on the basis of my race African American….

[Filing No. 44-2.]

**E. Subsequent Events**

On May 11, 2016, Mr. Johnson submitted a request to finish his May 12 shift one hour early so that he could attend a dentist appointment. [Filing No. 1 at 4.] Mr. Mangold offered Mr.

Johnson overtime on May 12, 2016, and Mr. Johnson believes that he did so knowing that he could not accept the opportunity. [Filing No. 1 at 4.] On May 18, 2016, Mr. Johnson filed an Official Grievance Report with the Union in which he stated:

> May 5 Thur. overtime was worked cutting grass in Garvin Park. I had been cutting there all day and the overtime was assigned to another employee. I ask to be made whole [for the] overtime worked by that employee on May 5.

[Filing No. 44-6.][2] Mr. Mangold offered Mr. Johnson and Mr. Haskins overtime on May 19, 2016, but both declined the opportunity. [Filing No. 44-9 at 5.]

Mr. Mangold became aware that Mr. Johnson had filed the Grievance and on May 20, 2016, Mr. Mangold announced during a morning meeting with the mowing crews that someone had complained about not getting overtime but otherwise did nothing about the grievance. [Filing No. 44-10 at 6.] Mr. Johnson claims that Mr. Mangold's hostile attitude toward him began on this day. [Filing No. 44-1 at 8.] The same day, Mr. Mangold called Mr. Johnson into his office and informed Mr. Johnson that he would be splitting up Mr. Johnson's two-person work crew because they were "behind in their duties." [Filing No. 1 at 4.] Mr. Johnson denies that his two-person crew was behind, but claims that another two-person crew "was the one that was behind." [Filing No. 44-1 at 8.]

Later that same day, Mr. Mangold followed Mr. Johnson to two different locations where Mr. Johnson mowed, including C.K. Newsome and Akin. [Filing No. 44-1 at 8.] Mr. Mangold would go to the parks weekly to "see if things were getting done the way they were – you know,

---

[2] Mr. Johnson filed a Declaration with his response brief in which he states that he "filed a second grievance against the City on May 9, 2018, alleging that Parks Department Director Brian Holtz 'denied equal opportunity[,]' and showed 'discrimination against Ernest Johnson.'" [Filing No. 55.] It is not clear what relevance Mr. Johnson thinks this second grievance has to this lawsuit. Because the statement refers to a grievance which was filed after Mr. Johnson filed this lawsuit, and since the lawsuit relates only to Mr. Johnson's denial of overtime opportunities in April and May 2016, the Court will disregard it as irrelevant.

they tell me they cut such and such a park, you know, the last day or so, I would go by; or I could look ahead of time and see, Wow, grass is really growin' so I would – I would try and be in the know of how things were going." [Filing No. 44-10 at 6.] Mr. Mangold may have encountered Mr. Johnson more than other mowing crew employees because Mr. Johnson "took care of C K Newsome, which is our main office, and I would go down there a couple times a day, so they would – they would be mowing either out front, or we have a courtyard as well which, you know, it's glass enclosed so there's not a lot of grass there, but there's a lot of leaves and – cleanup, really, is what they do in there mostly." [Filing No. 44-10 at 6.] Mr. Mangold never approached Mr. Johnson at these locations, although he watched him. [Filing No. 1 at 5.]

On that particular day, May 20, 2016, Mr. Mangold followed Mr. Johnson from Akin to a nearby Kentucky Fried Chicken restaurant where Mr. Johnson and his mowing crew partner were going to eat lunch. [Filing No. 44-1 at 8.] After lunch, while Mr. Johnson was working at Akin and sitting on a lawn mower, he looked at Mr. Mangold and Mr. Mangold made the shape of a gun with his fingers and pointed it at Mr. Johnson. [Filing No. 44-1 at 8.][3] Mr. Mangold had an "evil" look on his face. [Filing No. 44-1 at 11.] Mr. Johnson felt fear and "it has never ever left me, because I had seen him several times since I've been working and I don't know what day it [is] going to be that he [is] going to kill me." [Filing No. 44-1 at 8.] Mr. Johnson did not report this

---

[3] The City vehemently denies that Mr. Mangold made a gesture with his fingers pointing like a gun, and argues that Mr. Johnson made this allegation for the first time during his deposition testimony, and only after his counsel interjected and characterized the gesture as being in the shape of a gun. [*See, e.g.*, Filing No. 45 at 9.] The Court cannot weigh evidence or make credibility determinations on summary judgment, but must view all facts in the light most favorable to the non-movant – here, Mr. Johnson. *O'Leary*, 657 F.3d at 630. Accordingly, the Court must assume for purposes of summary judgment that Mr. Mangold made a gesture with his fingers pointed like a gun.

incident to Mr. Holtz or Human Resources because he did not think he would be believed. [Filing No. 44-1 at 10-11.]

Mr. Mangold did not learn that Mr. Johnson had filed an EEOC Charge until sometime after May 20, 2016.[4] [Filing No. 44-14 at 1.] On May 26, 2016, the City's Executive Director of Administrative Services, George Fithian, responded to Mr. Johnson's Union Grievance in a letter to the Union President and Business Manager, Charles Whobrey. [Filing No. 44-7.] Mr. Fithian wrote:

> Grievant claims he should have been offered overtime at the conclusion of his shift on May 5, 2016 pursuant to the "continuation of shift" language of Article VII, Section 9 of the [CBA]. On that date another employee was properly scheduled to work overtime beyond the conclusion of the shift he shares with the grievant. Grievant contends the other employee was scheduled for overtime on the date in question to work on the task that the grievant was working on during their regularly scheduled work hours. Further, grievant contends that per the "continuation of shift" language in Article VII, he should have been held over to continue that task in overtime.
>
> Because the other employee is senior to grievant, he was properly offered overtime that date before the grievant. This other employee was not scheduled to work overtime to work on the task grievant was working on during the regular shift that date. After finishing another assignment during the overtime period, the other employee was then assigned to that task the grievant had been working on. The other employee did not "continue the shift" to work on said task.
>
> As a result, this grievance is denied.

[Filing No. 44-7.][5] The Union did not seek an arbitration hearing on behalf of Mr. Johnson regarding the issues raised in Mr. Johnson's Grievance. [Filing No. 44-1 at 14.]

---

[4] The City's Human Resources Department did not receive the EEOC Charge until May 19, 2016. [Filing No. 44-13.]

[5] Mr. Johnson testified that a hearing was held on his Grievance and that Mr. Fithian informed him that it was too late to grieve all but the last day that Mr. Norman was given overtime and Mr. Johnson was not. [Filing No. 44-1 at 11.] Mr. Johnson testified that Mr. Fithian told him that he would pay Mr. Johnson for that last overtime opportunity, but then never did. [Filing No. 44-1 at 11.]

On June 6, 2016, Mr. Johnson bid on a position in Meter Maintenance with the City's Water Department, which would have resulted in a pay raise for him and would have involved working for a supervisor other than Mr. Mangold. [Filing No. 44-1 at 12.] The City awarded Mr. Johnson the job in June or July 2016, but he turned it down because he did not want to be "pushed out" of the mowing crew. [Filing No. 44-1 at 12-13.]

On July 28, 2016, Mr. Johnson (with the assistance of counsel) filed an Amended Charge of Discrimination with the EEOC. [Filing No. 44-1 at 7; Filing No. 44-5.] In the Amended Charge, Mr. Johnson alleged discrimination based on race and color and retaliation, and stated that the discrimination took place starting in April 2016 and was "ongoing." [Filing No. 44-5.] In his Amended Charge, he summarized the events discussed above, and alleged that he was not offered overtime on April 7, April 8, May 4, May 5, May 6, and May 11, 2016, but that Mr. Norman worked overtime on those dates. [Filing No. 44-5 at 1-2.]

Mr. Mangold retired in March 2017. [Filing No. 44-10 at 3.] Mr. Johnson has never been terminated, suspended, or given a written warning by Mr. Mangold. [Filing No. 44-1 at 8.]

### F.  The Lawsuit

On July 24, 2017, Mr. Johnson filed a Complaint against the City, asserting claims of race discrimination, hostile work environment, and retaliation in violation of Title VII and 42 U.S.C. § 1981, and also breach of contract related to the CBA. [Filing No. 1.] He abandoned his § 1981 claims in his response to the City's Motion for Summary Judgment, [Filing No. 51 at 11], and the Court **GRANTS** the City's Motion for Summary Judgment, [Filing No. 43], as to those claims. The Court now considers the City's Motion for Summary Judgment as to Mr. Johnson's remaining claims.

## III.
### DISCUSSION

The Court discusses the parties' arguments as they relate to each of Mr. Johnson's claims in turn.

### A. Title VII Race Discrimination

In support of its Motion for Summary Judgment, the City argues that Mr. Johnson's race discrimination claim fails because he did not suffer an adverse employment action. [Filing No. 45 at 16-17.] It also contends that Mr. Johnson cannot identify a similarly situated individual outside of his protected class who was treated more favorably than he was, because Mr. Norman was more senior than Mr. Johnson so is not similarly situated. [Filing No. 45 at 18.] Finally, the City argues that there is no evidence showing that it took an adverse employment action against Mr. Johnson based on his race because overtime was assigned based on a long-standing departmental practice, and Mr. Mangold's questioning of Mr. Johnson regarding what work he had completed, reassigning him, and observing him working do not raise a reasonable inference of discrimination. [Filing No. 45 at 20-24.]

In his response, Mr. Johnson argues that he suffered an adverse employment action because the amount he would have made had he been permitted to work overtime when Mr. Norman did was $698.88, or "approximately 90 percent of [his] regular weekly pay." [Filing No. 51 at 13.] He also argues that Mr. Norman is a comparator because there is evidence indicating that overtime was not assigned by seniority. [Filing No. 51 at 14.] He contends that the practice of assigning overtime based on seniority is a pretext for discrimination. [Filing No. 51 at 14-16.]

In reply, the City argues that when Mr. Mangold allowed all mowers to work overtime for a short period in April 2016, the situation was an "outlier, or exception created by rainy weather and Springtime grass-growth conditions...." [Filing No. 56 at 9.] It notes that when the unlimited

- 12 -

overtime situation ended, this did not mean that mowing crew members would never work over-time again. [Filing No. 56 at 9.] The City contends that even if Mr. Johnson could show that he suffered an adverse employment action, he cannot point to a similarly-situated comparator because the evidence shows that overtime was based on seniority, this practice was consistent with the language in the CBA, and Mr. Norman is not a similarly-situated comparator because he was senior to Mr. Johnson. [Filing No. 56 at 11-15.] Finally, the City reiterates it argument that there is no evidence indicating that the City's reason for assigning overtime to Mr. Norman rather than Mr. Johnson was pretextual. [Filing No. 56 at 15-16.]

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to his "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (quotation and citation omitted).

The Court's analysis of Mr. Johnson's Title VII claims comes over two and one-half years after the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Since that time, the Court of Appeals has had numerous opportunities to explain and apply *Ortiz* in a variety of employment contexts, and it is to this body of law that the Court now turns. *Ortiz* "discarded the long-standing practice of distinguishing between 'direct' and 'indirect' evidence in analyzing discrimination claims." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017) (citation omitted). Now, instead of separating evidence under different methods of proof, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of

evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cty., Illinois*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz, 834 F.3d at 765*).  In determining whether the evidence would permit a reasonable factfinder to conclude that Mr. Johnson's race caused him to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Khowaja v. Sessions*, 893 F.3d 1010, 1014 (7th Cir. 2018) (*Ortiz* was "only concerned with the proposition of sorting evidence into 'direct' and 'indirect' piles, and [its holding] did not alter the burden-shifting framework established in *McDonnell Douglas*….").  But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, --- Fed. App'x ----, 2019 WL 1011196, *2 (7th Cir. 2019).

At the heart of Mr. Johnson's race discrimination claim is his assertion that overtime was not really assigned by seniority or that, if it was, that was a pretext for discrimination.  But the undisputed evidence – including testimony from Mr. Mangold, Mr. Holtz, and Mr. Norman – indicates that overtime was assigned by seniority.  Although Mr. Johnson testified that when he first started working at the Parks Department Mr. Mangold would ask everyone who wanted to work overtime, and people would raise their hands, this does not conflict with the notion that overtime was actually then assigned based on seniority.  That the practice of assigning overtime based on seniority was not in writing and may have been in contravention of the CBA, and that there was not a list of employees by seniority, are all irrelevant.  Even if the overtime assignment policy

should have been in writing and/or violated the CBA, this – by itself – would not provide evidence of race discrimination.

What is relevant is whether the evidence "permits an inference of race discrimination." *Lloyd*, 2019 WL 1011196 at *2. In this case, it simply does not. While "[d]iscrimination may be inferred when an employer treats an employee in a protected class less favorably than it treats a similarly-situated employee outside that class," *de Lima Silva v. Dept. of Corrections*, 917 F.3d 546, 559 (7th Cir. 2019), Mr. Johnson has not put forth evidence indicating that was the case. His comparator, Mr. Norman, was undisputedly senior to him, and perhaps was assigned overtime because he had more experience or had worked at certain sites more than others. So, even if overtime was not assigned based on seniority *per se*, Mr. Norman had more experience than Mr. Johnson so is not a viable comparator. Moreover, Mr. Johnson has not pointed to any employees who were junior to him, yet were assigned overtime instead of him.

Additionally, while "[a]n inference of discrimination may follow when the employer's purported nondiscriminatory reason for taking an adverse action[6] against the employee was pretextual, meaning it was 'a lie' or 'a phony reason,'" *Id.* at 561, Mr. Johnson has not presented evidence showing that Mr. Mangold somehow made up the policy as a cover-up for discriminating against Mr. Johnson based on his race. To show pretext, Mr. Johnson would need to "'identify such weaknesses, implausibilities, inconsistencies, or contradictions'" in the City's reasons for not assigning him overtime "'that a reasonable person could find [it] unworthy of credence.'" *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings,*

---

[6] The parties disagree regarding whether Mr. Johnson suffered the type of adverse employment action needed to support a race discrimination claim. For purposes of summary judgment, the Court assumes that denying Mr. Johnson the opportunity to earn overtime pay was an adverse employment action.

*LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). Mr. Johnson has not presented any evidence indicating pretext, such as "shifting or inconsistent explanations" for how overtime was assigned. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015). Whether or not the policy of assigning overtime based on seniority actually existed, Mr. Johnson has not set forth any evidence contradicting Mr. Mangold's testimony that that is how he assigned overtime. And in any event, even if the City assigned overtime based on some criteria other than seniority, Mr. Johnson has not presented evidence that that criteria was race. Mr. Johnson must do more than "merely repeat[ ] that he believes he was treated differently from coworkers because of his race" because "personal beliefs are insufficient to give rise to a genuine factual dispute." *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (citation, quotation, and emphasis omitted). And "[s]imply being a member of a protected class, without something more to link that status to the action in question" is not sufficient. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016). That "something more" is just not present here.

Similarly, evidence that Mr. Mangold pointed at Mr. Johnson with his hands shaped like a gun, observed his work while Mr. Johnson was at two different sites on May 20, 2016, or offered Mr. Johnson overtime on a day when Mr. Mangold knew Mr. Johnson would not be able to work overtime, does not bolster Mr. Johnson's race discrimination claims. The gun gesture will be addressed in more detail below, but there is no evidence that it related in any way to Mr. Johnson's race. And a supervisor observing a subordinate's work does not constitute evidence of race discrimination under the circumstances presented here. Further, offering Mr. Johnson overtime on a day when Mr. Mangold knew (or should have known) that Mr. Johnson would not be able to work, while perhaps petty and mean if done intentionally, also does not show that the action was taken due to his race.

Mr. Johnson simply has not presented evidence showing that overtime opportunities were withheld from him due to his race. Accordingly, the City's Motion for Summary Judgment as to Mr. Johnson's Title VII race discrimination claim is **GRANTED**.

### B. Title VII Hostile Work Environment Claim

In support of its Motion for Summary Judgment, the City argues that not being offered overtime cannot support a hostile work environment claim because the reason for that had nothing to do with race but rather was because overtime is assigned based on seniority. [Filing No. 45 at 25.] It also contends that even if Mr. Mangold yelled at Mr. Johnson in front of others or informed him that he and his crew member were falling behind, those actions are not subjectively or objectively offensive. [Filing No. 45 at 25.] Additionally, the City argues that observing Mr. Johnson's work was just part of Mr. Mangold's job in supervising him, and that Mr. Mangold pointing at Mr. Johnson with his fingers shaped like a gun does not support an inference that the gesture was related to his race. [Filing No. 45 at 26.] The City notes that Mr. Johnson never reported any incidents, and that he had the chance to work for a different department where Mr. Mangold would not have been his supervisor, but he turned down the opportunity. [Filing No. 45 at 26.] Finally, the City argues that the actions Mr. Johnson relies on to support his hostile work environment claim were neither severe nor pervasive. [Filing No. 45 at 27-29.]

Mr. Johnson responds by arguing that Mr. Mangold threatened him, he was in fear, and "[a] reasonable person could find that [Mr.] Mangold's prolonged observation of [Mr.] Johnson, combined with [Mr.] Mangold's threatening 'gun gesture' are sufficient to create an objectively hostile work environment." [Filing No. 51 at 17-18.]

In its reply, the City reiterates it arguments that Mr. Johnson has not set forth any evidence showing that the City's actions were based on race or were severe or pervasive, as required for a hostile work environment claim. [Filing No. 56 at 17.]

Mr. Johnson explains in his response brief that he relies on Mr. Mangold's "prolonged observation" of him while working and on the "gun gesture" for his hostile work environment claim. It is on these actions that the Court focuses its analysis. [*See* Filing No. 51 at 17-18.]

An actionable hostile work environment claim requires the plaintiff to prove: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). Conduct cannot aid in creating an actionable hostile work environment unless it is related to the protected characteristic. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). The factors the Court may consider in deciding whether a work environment is hostile include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (citation and quotation marks omitted). The key issue is whether the conduct at issue "qualifies as sufficiently severe or pervasive to alter the conditions of [the] work environment." *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 637 (7th Cir. 2019).

The evidence, even when viewed in the light most favorable to Mr. Johnson, is not sufficient to withstand the City's Motion for Summary Judgment. First, Mr. Mangold observing Mr. Johnson while working on May 20, 2016 simply could not be construed by a reasonable juror as constituting conduct so severe and pervasive to support a hostile work environment claim. *See*

*Matthews v. Donahoe*, 2012 WL 4378272, \*2 (7th Cir. 2012) (summary judgment for defendant on hostile work environment claim appropriate where plaintiff claimed, among other things, that her supervisors excessively scrutinized her work because plaintiff had not shown "a pattern of threatening or humiliating harassment or a workplace permeated with discriminatory ridicule, intimidation, or insult").

Second, Mr. Mangold pointing at Mr. Johnson on a single occasion with his fingers shaped like a gun also does not support a hostile work environment claim. Title VII is "not… a general civility code," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation and citation omitted), and while such a gesture may have been rude and even intimidating, it does not create liability for a hostile work environment. While racially charged conduct by a supervisor is treated "as much more serious than a co-worker's [conduct]," *Gates*, 916 F.3d at 637-38, there is no evidence that the gun gesture was motivated by Mr. Johnson's race. The gesture must have had "a racial character or purpose" in order to create a hostile work environment. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (allegation that harasser "raised his fist as a black power symbol" was not sufficient to support hostile work environment claim because there was "a lack of support showing that [the harasser's] gesture was meant as a racial attack"). Here, evidence of a racial character or purpose is lacking.

Additionally, the two incidents upon which Mr. Johnson relies – Mr. Mangold following Mr. Johnson to the work site and observing him while working, and Mr. Mangold making the gun gesture – took place on the same day. In certain instances a very limited number of incidents can support a hostile work environment claim, but there still must be a link to a racial motivation. *See Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("there is no 'magic number' of slurs that indicate a hostile work environment," and "an unambiguously racial epithet falls

on the 'more severe' end of the spectrum").  But here, a reasonable jury could not conclude that Mr. Mangold observing Mr. Johnson's work and pointing at him with his fingers in the shape of a gun on May 20 was severe or pervasive enough to create a hostile work environment.  *See Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (in order to succeed on hostile work environment claim, employee must be subjected "to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment") (quotation and citation omitted).

The Court **GRANTS** the City's Motion for Summary Judgment on Mr. Johnson's hostile work environment claim.

### C.  Title VII Retaliation Claim

The City argues in support of its Motion for Summary Judgment on Mr. Johnson's Title VII retaliation claim that Mr. Mangold was not aware of Mr. Johnson's EEOC Charge when any of the actions which Mr. Johnson claims were retaliatory took place.  [Filing No. 45 at 30-31.]  It also contends that the allegedly retaliatory actions were not materially adverse employment actions.  [filing No. 45 at 31-33.]

Mr. Johnson responds by stating that Mr. Johnson filed his EEOC Charge on May 4, 2016, it was received by the City's Human Resources Department, and "[o]n the very next day, [Mr.] Mangold harassed [Mr.] Johnson, followed and surveilled [Mr.] Johnson for a period of several hours, and made a violent, threatening gesture toward [Mr.] Johnson."  [Filing No. 51 at 18.]

In its reply, the City argues that Mr. Johnson ignores Mr. Mangold's testimony that he was not aware of Mr. Johnson's EEOC Charge on May 20, 2016, when the alleged retaliatory acts occurred.  [Filing No. 56 at 20.]  The City also argues that although Mr. Mangold was aware of

Mr. Johnson's Grievance on May 20, Mr. Johnson did not raise any issues related to discrimination, retaliation, or hostile work environment, or anything related to race, in the Grievance, so the filing of the Grievance was not protected activity under Title VII. [Filing No. 56 at 20.]

To survive summary judgment on his retaliation claim, Mr. Johnson must present evidence showing "'that [ ] he suffered a materially adverse action because [ ]he engaged in protected activity.'" *Lloyd*, 2019 WL 1011196 at *4 (quoting *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016)). The question is "whether the evidence produced would permit a reasonable factfinder to conclude [Mr. Johnson's race] caused the [adverse action]." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

Mr. Johnson appears to base his retaliation claim only on the filing of his EEOC Charge, [Filing No. 51 at 18 (Mr. Johnson only mentioning EEOC charge in his response to the City's arguments regarding his retaliation claim)], but the Court will address whether his Grievance can form the basis for his retaliation claim out of an abundance of caution. Mr. Johnson filed his Grievance on May 18, 2016 and Mr. Mangold was aware of the Grievance when he observed Mr. Johnson on May 20 and made the gun gesture. [Filing No. 44-1 at 8; Filing No. 44-6.] But Mr. Johnson did not mention racial discrimination or a hostile work environment in his Grievance – he only complained generally that overtime had been assigned to another employee. [Filing No. 44-6.] Because Mr. Johnson's Grievance did not complain of treatment that was due to being a member of a protected class, it cannot form the basis for a retaliation claim. *See Curtis v. Earnest Mach. Prods. Co.*, 2012 WL 5879439, *2 (S.D. Ind. 2012) (Plaintiff's email to management regarding supervisor "inappropriately leaving the warehouse, failing to show up for portions of his shift, forgetting Plaintiff's work schedule, and inappropriately assigning work" did not constitute statu-

torily protected activity where email did not complain that actions occurred due to plaintiff's membership in a protected class); *Tomanovich v. City of Indianapolis*, 457 F.3d 658, 664 (7th Cir. 2006) (where plaintiff complained about pay discrimination, but not that the discrimination resulted from his membership in a protected class, his grievance did not constitute protected activity for purposes of Title VII's anti-retaliation provisions); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (employee must "oppose[ ] conduct prohibited by Title VII, or at a minimum [have] a reasonable belief he was challenging such conduct" in order to engage in statutorily protected activity) (citation and quotation omitted).

As for his EEOC Charge, Mr. Johnson filed it on May 4, 2016, but Mr. Mangold testified that he did not learn of the EEOC Charge until sometime after May 20, 2016. [Filing No. 44-2; Filing No. 44-14.] Accordingly, the events Mr. Johnson relies on in connection with his retaliation claim – which all took place before Mr. Mangold knew of the EEOC Charge – cannot support a claim of retaliation based on the Charge. Mr. Mangold cannot have retaliated against Mr. Johnson for something that he did not know about. *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (in order to demonstrate causal connection needed for retaliation claim, plaintiff must show that the defendant "would not have taken the adverse…action but for [the] protected activity") (citation and quotation omitted).

Because Mr. Johnson's Grievance did not relate to racial discrimination, and since the acts which Mr. Johnson claims were retaliatory all took place before Mr. Mangold became aware that Mr. Johnson had engaged in statutorily protected activity by filing the EEOC Charge, the Court **GRANTS** the City's Motion for Summary Judgment as to Mr. Johnson's Title VII retaliation claim.

**D. Breach of Contract Claim**

The City argues in support of its Motion for Summary Judgment that Mr. Johnson's breach of contract claim is preempted by Section 301 of the Labor Management Relations Act (the "LMRA") because the claim is based on the CBA. [Filing No. 45 at 35.] It also argues that because it cannot be considered an "employer" under the LMRA, it is immune from suit. [Filing No. 45 at 35.]

In response, Mr. Johnson argues that his claim is not preempted because the LMRA only applies to industries affecting commerce and because the City is not considered an "employer" under the LMRA. [Filing No. 51 at 18-19.]

In its reply, the City argues that the LMRA preempts claims founded directly on the CBA, or that directly implicate the CBA. [Filing No. 56 at 21.] It also argues that Mr. Johnson could have "avoid[ed] this remedial gap of sorts by pursuing the appropriate procedural route and remedy through arbitration as provided under the grievance procedure," but did not "exhaust any arbitral procedure that might have been available" after the City denied his Grievance. [Filing No. 56 at 22.]

Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). "Employer" is defined as "any person acting as an agent of an employer, directly or indirectly, but shall not include…any State or political subdivision thereof…." 29 U.S.C. § 152(2). The City is a political subdivision of the State of Indiana. Ind. Code § 34-6-2-110 (defining "political subdivision" as city, among other things), and so is not an "employer"

under § 301. The Court rejects the City's argument that Mr. Johnson's breach of contract claim is preempted by § 301, but that it is then "immune" from suit under § 301 because it is not considered an "employer." Rather, a suit for violation of the CBA cannot be brought against the City under § 301(a) of the LMRA, so the LMRA does not preempt Mr. Johnson's breach of contract claim.[7]

Because the Court has granted summary judgment to the City on all of Mr. Johnson's federal claims, and has found that his breach of contract claim is not preempted by the LMRA, the Court must determine whether it will exercise jurisdiction over Mr. Johnson's breach of contract claim. The district court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction….") (citation and quotation omitted). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every state of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 183 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Court finds that the balance of factors weighs in favor of declining to exercise supplemental jurisdiction over the remaining state law claim. First, as to judicial economy, although discovery has been completed, the parties have not briefed the substantive issues related to the

---

[7] Additionally, it is not clear whether the Parks Department is "an industry affecting commerce." Mr. Johnson claims that it is not, the City argues that it is, but neither party provides any legal analysis whatsoever. Because the City is not an "employer" for purposes of § 301(a) in any event, the Court need not decide whether Mr. Johnson's mowing crew job is in an industry affecting commerce.

breach of contract claim – they have only addressed the preemption issue.  Second, as far as convenience, witnesses and evidence related to the breach of contract claim would likely be located in Evansville, where a state court could decide the claim, and not in Indianapolis, where this Court is located.  And third and fourth, whether the Parks Department's overtime policy breached the CBA is a quintessentially local issue, which is best decided by a state court, making the interests of fairness and comity factors weigh in favor of this Court declining to exercise supplemental jurisdiction over the state law breach of contract claim.

The Court **DENIES** the City's Motion for Summary Judgment as to Mr. Johnson's breach of contract claim, but declines to exercise supplemental jurisdiction over that claim and **DISMISSES** it **WITHOUT PREJUDICE**.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** the City's Motion for Summary Judgment as to Mr. Johnson's Title VII and § 1981 race discrimination, hostile work environment, and retaliation claims and **DENIES** the City's Motion for Summary Judgment as to Mr. Johnson's breach of contract claim, but declines to exercise supplemental jurisdiction over that claim and **DISMISSES** it **WITHOUT PREJUDICE**.  [43].  Final judgment shall enter accordingly.

Date: 5/7/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**